UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                              Case No.:  2:06-cr-8-FtM-29SPC

JEREMY JEROME MOORE
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

       This matter comes before the Court on the Defendant Jeremy Jerome Moore's Motion to Suppress (Doc. # 19) filed on March 1, 2006.  On March 23, 2006, the Court held a hearing on the matter before the Honorable Sheri Polster Chappell, United States Magistrate Judge.  The Government was represented by Assistant United States Attorney Jesus Cases, the Defendant was present and represented by Assistant United States Public Defender Russell Rosenthal.  At that hearing, the Government called Officer Candice Derrig and Officer Jeremy Hawkins as its witnesses.  The Defendant did not call any witnesses.

**TESTIMONY AND EVIDENCE**

**Ofc. Candice Derrig**: (Tr. 4-65).

       Ofc. Derrig has served with the City of Fort Myers Police Department (FMPD) for approximately two and one half years. (Tr. 4:19-25).  She currently works as a road patrol officer. (Tr. 4:21-22).  Ofc. Derrig testified to the events that took place in the early morning hours of July 23, 2005.

       Ofc. Derrig testified that at approximately 1:53 a.m. on July 23, 2005, a silver Dodge Stratus (the vehicle) in which the Defendant was riding passed her position near the intersection of Woodside

and Van Buren roads. (Tr. 5:3-12). As the vehicle passed her position, Ofc. Derrig noticed that the vehicle tag light was out and that the vehicle's window tinting appeared to be too dark. (Tr. 5:12-16). She stated that she could not see through the rear window nor could she see any silhouettes inside the vehicle which led her to believe that the tinting was illegal. (Tr. 6:14-24). According to Ofc. Derrig, she pulled out and followed the vehicle and approached to within twenty (20) feet of the rear of the vehicle. (Tr. 5:19-23). She turned off the head lights on her patrol car and confirmed that the vehicle's tag light was inoperative. (Tr. 6:6-10).

Ofc. Derrig made a traffic stop on the vehicle just east of Woodside and Oleander. (Tr. 11:23-25). After she initiated the stop, Ofc. Derrig made a call for back up. (Tr. 12:21-24). Ofc. Derrig stated that it is her normal policy to stop vehicles with no tag light and/or with illegal tinting. (Tr. 7:23-25, 8:1-4). As Ofc. Derrig approached the driver's side of the vehicle, the driver rolled down his window. (Tr. 14: 9-16 ). Ofc. Derrig then asked the driver to roll down the back passenger window on the driver's side so that she could see everyone in the vehicle. (Tr. 14:13-16). The backup, Ofc. Jeremy Hawkins, arrived within twenty (20) to thirty (30) seconds after receiving the call, but after the windows in the vehicle had been rolled down. (Tr. 14:19-25, 15:1-2 ).

Ofc. Derrig testified that as she approached the driver's side window, she could smell a strong odor of marijuana emanating from the vehicle. (Tr. 15:8-10, 22: 2-8). As she observed the occupants of the vehicle, she noticed that the back seat passenger, identified as the Defendant, had a dark green leafy substance "shake" scattered down the front of his shirt. (Tr. 15:6-10, 42:9-17). She recognized the substance as marijuana from her training and experience. (Tr. 15: 19-25, 16:1-8). According to Ofc. Derrig, the pieces of Marijuana on the Defendant's shirt were not seized as evidence but a marijuana cigarette was recovered from the vehicle. (Tr. 43: 4-8). Ofc. Derrig stated

that she had her flashlight pointed at the Defendant so she could clearly see into the vehicle. (Tr. 18:2-3).

Ofc. Hawkins had arrived as backup and so Ofc. Derrig moved around to the back passenger side door and asked the Defendant to exit the vehicle. (Tr.16:15-20). According to Ofc. Derrig, Ofc. Hawkins remained at the driver's side door. (Tr. 17:13-15). At this time, neither officer had their firearms drawn. (Tr. 17:8-12). As the Defendant began to exit the backseat, Ofc. Derrig noticed that he seemed to be stalling and that he reached for a white T-shirt that was laying beside him on the seat. (Tr. 18: 13-15). As he exited the vehicle, Ofc. Derrig saw the Defendant attempted to pull the white shirt over a handgun which was lying on the seat underneath where the Defendant was sitting. (Tr. 18: 14-22, 19: 7-10). As he began to exit, she saw the entire gun laying on the seat. (Tr. 18:14-22, 55:15-24). Ofc. Derrig and Ofc. Hawkins both pulled their guns and announced "signal zero" which is the code that a firearm is present. (Tr. 19: 14-25, 57: 1-12). At that time, the Defendant was pulled from the vehicle, his hands were cuffed, and he was placed in the back of Ofc. Derrig's patrol car. (Tr. 20: 1-5, 57: 20-23). Ofc. Hawkins controlled the driver and other passenger remaining in the vehicle, and then removed the gun. (Tr. 48: 7-25, 58: 7-24).

Ofc. Derrig wrote citations to the vehicle's owner for the illegal tinting and the inoperative out tag light. (Tr. 20:11-13). Ofc. Derrig's tint meter confirmed that the window tinting only allowed 4% of light to penetrate while the statute requires at least 15% penetration. (Tr. 11:4-14). Ofc. Derrig stated that the citations were written at approximately 2:21am. It took about ten (10) minutes from the time the vehicle was stopped until the Defendant was removed from the back of the vehicle. (Tr. 21: 1-11).

Ofc. Derrig testified that she did not know the Defendant nor the other individuals in the front seat. (Tr. 39: 3-22). She also testified that she did not take any photos of the handgun or the vehicle.(Tr. 36: 9-15, 59:3-5).

**Ofc. Jeremy Hawkins**: (Tr. 65-81).

Ofc. Hawkins has served with the FMPD for approximately one year and four months. (Tr. 66: 4-8). He is currently serving as a road patrol officer.(Tr. 66: 9-10). He testified to the events that occurred in the early morning hours of July 23, 2005.

Ofc. Hawkins testified that he was called as backup for Ofc. Derrig who had made a traffic stop for an inoperative tag light and illegal window tinting. (Tr. 66:17-25). He stated that as he approached the vehicle he could smell a strong odor of marijuana emanating from the vehicle. (Tr. 67:1-3). He noted that the passengers side front and back windows were rolled down. (Tr. 67: 4-9). There were three people in the vehicle. (Tr. 67: 18-20). There were two people in the front seat and one person in the back seat whom he identified as the Defendant. (Tr. 67:21-25, 68: 1-3).

Ofc. Hawkins observed what he believed to be marijuana on the shirt of the Defendant while he was still sitting in the back seat. (Tr. 68:1-3). Ofc. Hawkins testified that he seized the green leafy substance found on the Defendant's shirt and off the floor board of the vehicle. (Tr. 75: 19-24). The substance later field tested positive for marijuana. (Tr. 80: 23-25, 81: 1-3).

Ofc. Hawkins and Ofc. Derrig both asked the Defendant to get out of the vehicle. (Tr. 70: 7-8). As the Defendant was exiting the vehicle he had one foot out on the ground, Ofc. Hawkins kept his flashlight shining on his left hand to make sure the Defendant did not try to hide anything or have a gun. (Tr. 73: 5-15). The Defendant hesitated, and then reached back and grabbed a t-shirt laying by him on the backseat and drug it over a gun. (Tr. 71: 23-25, 72: 1-6). Ofc. Hawkins said that he

could clearly see about one third of the gun protruding from the crack of the back seat next to where the Defendant was seated. (Tr. 70:14-23). Ofc. Hawkins said he could see the handle and part of the slide. (Tr. 70: 15-23). The hand grip of the weapon was black rubber and the remainder of the weapon was silver. (Tr. 71: 1-9). Upon seeing the gun, Ofc. Hawkins called out "signal zero" and he drew his gun, took the Defendant by the arm, and removed him from the vehicle. (Tr. 72: 13-24).

Ofc. Derrig handcuffed the Defendant while Ofc. Hawkins watched the two individuals in the front seat. (Tr. 72: 19-22). Ofc. Hawkins testified that the gun remained on the back seat because he felt it was far enough away from the others to remain safe. (Tr. 73: 20-25, 1-7). Ofc. Derrig returned and helped remove the driver from the vehicle. (Tr. 74: 18-22). The passenger was handicapped so they had to wait for the detectives to arrive to remove the front seat passenger from the vehicle. (Tr. 74: 18-25, 75: 1-2). After everyone was removed from the vehicle, Ofc. Hawkins secured the gun and placed it on the vehicle's trunk. (Tr. 75: 3-9). Ofc. Hawkins stated that he was not absolutely sure but he believed that Ofc. Derrig then took photos of the scene although he never saw any of the photos. (Tr. 75: 10-18).

## DISCUSSION

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001).
The Defendant argues that the officers violated his Fourth Amendment rights because: (1) there was not a sufficient basis to stop his vehicle; (2) that the Defendant was illegally detained; and (3) the subsequent search of the vehicle was not supported by probable cause. The Government responds that the Defendant lacks standing to contest the traffic stop or in the that the Officers had reasonable

suspicion that the driver of the vehicle had committed a traffic violation and that after the stop was made, that the Officers had probable cause to search the vehicle.

*(1) Whether the Defendant has Standing to Challenge the Traffic Stop*

At the outset of its analysis, the Court must determine if Moore has standing to challenge Ofc. Derrig's initial traffic stop of the vehicle. The Supreme Court has been very clear that Fourth Amendment rights are personal rights which like some other constitutional rights may not be vicariously asserted. Rakas v. Illinois, 439 U.S. 128, 134, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). The individual challenging the search bears the burden of proof that he has standing to assert his Fourth Amendment rights. U.S. v. Copper, 133 F.3d 1394, 1398 (11th Cir. 1998). The right to challenge a search or seizure as a violation of the Fourth Amendment turns on "whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place." O'Rourke v. Hayes, 378 F.3d 1201, 1206 (11th Cir. 2004) (holding that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched). Courts have consistently held that individuals have a reduced privacy expectation in their automobiles. Bourgeois v. Peters, 387 F.3d 1303, 1315 (11th Cir. 2004). Thus to have standing to challenge the stop of the vehicle, Moore must establish that he had a reasonable expectation of privacy that society is prepared to recognize as reasonable. Copper, 133 F.3d 1394.

In this case, Moore had no ownership interest or possessory interest in the subject vehicle. Although each case is fact specific, case law has established some general boundaries as to what society will accept as reasonable regarding privacy in a motor vehicle. Id. at 1398. As such, a passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents,

regardless of whether the driver owns or rents it. Id.    Therefore, the Court must conclude that Moore lacks standing to challenge the original traffic stop of the vehicle. Nevertheless, the Court will proceed and address the original stop of the vehicle by Ofc. Derrig.

### *(2) Whether the Traffic Stop was Valid*

The temporary detention of a motorist during a traffic stop is constitutional if probable cause exists to believe a traffic violation has occurred. Whren v. U.S., 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996). The Fourth Amendment test for a traffic stop is whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Id. Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-1662 (1996).

Ofc. Derrig testified that she stopped the vehicle under Fla. Stat. § 316.610, because the tag light was inoperative and because the window tinting appeared to be too dark. (Tr. 5:12-16). Florida Statute § 316.610 states in pertinent part:

> It is a violation of this chapter for any person to drive or move, or for the owner or his or her duly authorized representative to cause or knowingly permit to be driven or moved, on any highway any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person or property, or which does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required in this chapter, or which is equipped in any manner in violation of this chapter, or for any person to do any act forbidden or fail to perform any act required under this chapter.

Furthermore, under Florida law, an officer may at anytime, upon reasonable cause to believe that a vehicle is unsafe, or that the equipment is not functioning properly, require the driver to stop in order to inspect the vehicle. Fla. Stat. § 316.610(1). Thus, Fla. Stat. § 316.610(1) expressly gives officers

the authority to require the driver of a vehicle to stop and submit the vehicle to an inspection if the officer has reasonable cause to believe that the vehicle is not equipped as required by law. Hilton v. State, 901 So. 2d 155, 157 (Fla. 2d DCA 2005).

Ofc. Derrig testified the vehicle had an inoperative tag light and that she believed the tinting on the rear window was not in compliance with the Florida Statutes. (Tr. 5:12-16). As seen above, Florida law requires that all lamps on the vehicle must be in working order. Furthermore, Florida law allows an officer to stop a vehicle in instances where the officer believes the vehicle's window tinting is too dark. State v. Moore, 791 So. 2d 1246 (Fla. 1st DCA 2001). Ofc. Derrig's testimony that she stopped the vehicle because the tinting appeared too dark was unrebutted and there was no indication that her testimony was not credible with regard to the window tinting. In fact, Ofc. Derrig's tint meter showed that the rear window only allowed light transmittance at 4%. Under Florida law, a vehicle's window must allow light transmittance at no less than 28%. *See* U.S. v. Weaver, 145 Fed. Appx. 639, 641 (11th Cir. 2005) (citing Fla. Stat. § 316.2953, holding that a traffic stop was supported by probable cause where the officer believed the vehicle's window tinting was in violation of Florida's legal limits)). Thus, based upon Florida's Statutes and the relevant case law, Ofc. Derrig had reasonable suspicion to believe that the driver of the vehicle had committed a traffic violation and, therefore, the Fourth Amendment test for conducting a traffic stop was not violated.

### *(3) Whether the Defendant was Improperly Detained*

An officer having reason to believe that an individual has committed, is committing or is about to commit an offense can temporarily detain the individual to investigate the circumstances. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed. 2d 889 (1968). A traffic stop is like a Terry stop. U.S. v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (citing U.S. v. Tapia, 912 F.2d 1367 (11th Cir.

1990)(holding the reasonableness of a police officer's decision to detain and search a vehicle is governed by the principles set forth in Terry v. Ohio)). Once the purposes of the initial traffic stop are completed the officer cannot further detain a vehicle or its occupants unless something occurred during the traffic stop that created a reasonable suspicion to justify further detention. U.S. v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (citing U.S. v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995). Otherwise, the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)).

If during a traffic stop an officer develops a reasonable suspicion of the commission of an offense, then additional time is warranted to investigate the reasonable suspicion. U.S. v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). The smell of marijuana emanating from a vehicle gives an officer probable cause to search the vehicle without a warrant. U.S. v. Griffin, 109 F.3d 706, 708 (11th Cir. 1999). Furthermore, under Terry v Ohio, officers are allowed to detain a person to determine if in fact the person has violated the law. Pruitt, 174 F.3d at 1219 (holding that police may detain people if there is a reasonable suspicion that they are involved in criminal activity). The reasonableness standard only requires that a police officer be able to point to specific articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion. Pruitt, 174 F.3d at 1219.

Here, Ofc. Derrig and Ofc. Hawkins both testified that they could smell a strong odor of marijuana emanating from the vehicle and that the Defendant had a green leafy substance that appeared to be marijuana on the front of his shirt. (Tr. 15:6-10, 42:9-17, 68:1-3). Thus, the Officers established reasonable and articulable facts that warranted a short delay to further investigate the surrounding circumstances. Therefore, the Officers did not violate the Defendants Fourth Amendment rights by detaining the Defendant to search the subject vehicle.

### *(4) Whether the Ofcs. Derrig and Hawkins had Probable Cause to Search the Vehicle*

The Defendant argues that the initial stop of the vehicle was improper and that the officers subsequent search and seizure of the firearm was not supported by probable cause. "While it is true that the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search, there is what has become known as the automobile exception to the warrant requirement." U.S. v. Watts, 329 F.3d 1282, 1284 (11th Cir. 2003). The automobile exception holds that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Id. at 1285 (citing Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485 (1996). No special exigency is required beyond a showing that the vehicle is mobile. Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013 (1999) (*per curiam*). Furthermore, as noted above, an officer has good reason justifying a warrantless search of a vehicle where he/she smells a strong odor of marijuana coming from a vehicle. Griffin, 109 F.3d at 708; State v. Bennett, 481 So. 2d 971, 972 (Fla. 5th DCA 1986) (holding that the smell of marijuana emanating from a vehicle gives an officer probable cause to search a vehicle without a warrant).

The Supreme Court has held that if there was probable cause to search a vehicle, a warrantless search would not be deemed a violation of the Fourth Amendment if the facts of the case would have justified a warrant even though a warrant was not actually obtained. U.S. v. Ross, 456 U.S. 798, 809, 102 S. Ct. 2157, 2152 (1982). In the instant case, the officers had probable cause to search the vehicle due to the strong odor of marijuana emanating from inside the vehicle. Griffin, 109 F.3d at 708; Bennett, 481 So. 2d at 972.

The Court has previously determined that the traffic stop was valid pursuant to Florida law. The strong odor of marijuana emanating from the vehicle and the appearance of a green leafy substance on the shirt of the Defendant, without anything further, gave Ofcs. Derrig and Hawkins sufficient cause to conduct a warrantless search on the vehicle.

Additionally, an officer may also take such steps as are reasonable to protect their personal safety. U.S. v Francis, 140 Fed. Appx. 184, 185 (11th Cir. 2005). This includes a protective search of the driver, the passengers, and the vehicle. Purcell, 236 F.3d at 1277. The officer may use a flashlight to illuminate a vehicle's dark interior and may seize any contraband, including weapons, in plain view. Id. (citing Michgan v. Long, 436 U.S. 1032, 1049-1051, 103 S. Ct. 3469, 77 L Ed. 2d 1201 (1983). From the testimony presented at the hearing it must be concluded, that pursuant to a valid traffic stop and subsequent valid warrentless search, Ofcs. Derrig and Hawkins saw a firearm exposed on the back seat after the Defendant began to exit from where he was seated. According to their collective testimony, the firearm was underneath the Defendant and became visible as he slid over toward the passenger side of the vehicle to exit. (Tr. 18:14-22, 55:15-24, 70:14-23). Although the Officer's testimony differs as to whether the gun was laying in full view on the seat or if only a third of the gun was visible protruding from the crack in between the seat cushions, both Officers testified to seeing the gun in plain view on the back seat after the Defendant attempted to slide over and exit the vehicle. Thus Ofcs. Derrig and Hawkins did not violate the Defendant's Fourth Amendment right when they seized the firearm.

Accordingly, it is now

**RECOMMENDED:**

The Defendant Jeremy Jerome Moore's Motion to Suppress (Doc. # 19) should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___20th___ day of April, 2006.

*[signature]*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record